NOT FOR PUBLICATION

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| **GARY WESTBERRY and AMANDA KOONTZ,** | Civ. Action No. 15-07998 (JMV) |
| *Plaintiffs,* | **OPINION** |
| v. |  |
| **STATE OPERATED SCHOOL DISTRICT OF NEWARK and SUPERINTENDENT CAMI ANDERSON,** |  |
| *Defendants.* |  |

<u>**John Michael Vazquez, U.S.D.J.**</u>

### I.  INTRODUCTION

This matter comes before the Court on Defendants State Operated School District of Newark (the "District") and Superintendent Cami Anderson's (collectively "Defendants") partial motion to dismiss. D.E. 19. The Court reviewed all submissions in support and opposition, and considered the motion without oral argument pursuant to Federal Rule of Civil Procedure 78 and Local Civil Rule 78.1(b). For the reasons that follow, the Court grants in part and denies in part Defendants' motion.

### II. BACKGROUND

Plaintiff Gary Westberry[1] is currently employed as a teacher for the District and is also the head of athletics for a District high school.  Complaint ("Compl.") ¶¶ 3, 94.  Plaintiff has

---

[1] The Court will refer to Gary Westberry as "Plaintiff" or "Westberry."  The Court will refer to Amanda Koontz as "Plaintiff Koontz."  Plaintiff Koontz is Plaintiff's spouse.  Collectively, they shall be known as "Plaintiffs."

been employed by the District since 1988 when he began working as a *per diem* math teacher. *Id.* ¶ 17. He holds two master's degrees, is certified as a mathematics teacher and supervisor, is nationally certified as an athletic administrator, and has a "Principal Certificate of Eligibility." *Id.* ¶¶ 15-16.

In September 1990, Plaintiff became a full-time math teacher. *Id.* ¶ 18. In September 2000, Plaintiff was promoted to Athletic Director and Vice Principal of Weequahic High School in Newark ("Weequahic"). *Id.* ¶ 21. That same year, Plaintiff joined the City Association of Supervisors and Administrators ("CASA"), which is the union that represents athletic directors, vice principals, and principals. *Id.* ¶¶ 24-25. In 2009, CASA's collective bargaining agreement with the Newark Schools expired and negotiations for a new contract started. *Id.* ¶ 28. In 2013, Plaintiff was elected to CASA's nine-member executive board. *Id.* ¶ 26.

As of February 2013, CASA and the District still had not reached a new agreement. At that time, Defendant Superintendent Anderson announced her intention to eliminate 129 administrative positions in the district, which included department chairpersons, directors, supervisors, and athletic directors. *Id.* ¶¶ 31-32. Plaintiff alleges that this action "appeared to be a direct assault against older, tenured, employees; many of which were male and of African American ethnicity." *Id.* ¶ 34. During an advisory board meeting for the District on March 26, 2013, Plaintiff spoke out against Superintendent Anderson and her intention to eliminate the administrative positions. *Id.* ¶¶ 36. Plaintiff alleges that the advisory board attempted to prevent him from speaking even though he had properly submitted a request to speak. *Id.* ¶ 37. When Plaintiff was eventually allowed to speak, Superintendent Anderson "walked off the panel in an angry huff." *Id.* ¶ 40. Plaintiff spoke about the negative ramifications that eliminating the District's athletic director positions would have on student athletes and their opportunities to

participate in college athletics. *Id.* ¶¶ 40-41. On April 23, 2013, Plaintiff also commented at another advisory board meeting, once again voicing his concerns about the elimination of the athletic director position. *Id.* ¶¶ 42-43. Plaintiff alleges that shortly thereafter, he was retaliated against for his public comments.

On June 1, 2013,[2] Superintendent Anderson denied Plaintiff's application to serve as an administrator in the District's summer program. *Id.* ¶ 47. Plaintiff had held such a position for every year since 1991, serving as Principal of the program in 2011 and 2012. *Id.* ¶ 48. Plaintiff alleges that "Superintendent Anderson carried out her plan to discriminate against older[] males of African American ethnicity by eliminating the position of Athletic Director and reclassified all Athletic Directors as either Interim Heads of Athletic[s] or as Interim Vice Principals." *Id.* ¶ 49. Plaintiff does not provide a timeframe for this action. Next, Plaintiff was reassigned as the Interim Vice Principal of Mathematics at Weequahic for the 2013-14 school year. *Id.* ¶ 50. Throughout the school year, the District removed "Interim" from the title of all the other newly assigned Interim Vice Principals, except for Plaintiff. *Id.* ¶ 51. Plaintiff alleges that "the older Caucasian female and the younger male had the characterization of 'Interim' removed from their titles." *Id.* ¶ 52. Despite Plaintiff's "repeated requests, he remained an Interim Vice Principal throughout his assignment at Weequahic." *Id.* ¶ 53. Plaintiff claims that the District's "targeted demotion" caused him to be ineligible to participate in a program necessary to complete "the two-year residency for Standard Principal Certification," which irreparably damaged Plaintiff's reputation and caused him to be turned down for jobs. *Id.* ¶¶ 54-55 n.3.

---

[2] The Amended Complaint alleges the year to be 2014. However, this appears to be a typographical error because Plaintiff indicates that his summer administrator position was denied shortly after speaking out in March and April 2013.

Plaintiff notes that he "excelled in the position of Interim Vice Principal" by "exceed[ing] the school['s] goal of a 10% increase in the student's [sic] scores on the mathematics section of the High School Proficiency Assessment." *Id.* ¶ 56. Despite this success, in June 2014, Plaintiff was informed that his contract as vice principal would not be renewed for the 2014-15 school year. *Id.* ¶¶ 57, 59. Plaintiff alleges that once it became known that he was not returning to Weequahic, the Principal of McKinley Elementary School offered him a position as Vice Principal. *Id.* ¶ 61. According to Plaintiff, another candidate for an administrative position at McKinley, who was "a younger Caucasian female, was not required to interview for the position." *Id.* ¶ 63. Plaintiff, however, was required to interview and participate in the application process. *Id.* ¶ 62. Plaintiff submitted an application for the McKinley vice principal position on June 13, 2014. *Id.* ¶ 64.

On June 27, 2014, Assistant Superintendent Gary Beidleman, who reports directly to Superintendent Anderson, performed an evaluation of Plaintiff and rated him as "partially effective" for the first time in Plaintiff's career. *Id.* ¶ 65. Plaintiff alleges that Beidleman had no support for the rating because Beidleman had not conducted a single observation of Plaintiff throughout the year. *Id.* ¶ 67. CASA filed a grievance regarding Plaintiff's evaluation, which had not been resolved when this case was instituted. *Id.* ¶ 68.

On August 8, 2014, Plaintiff interviewed with the District's Executive Director of Staffing, Kimberly Kassnove, and her assistant. *Id.* ¶ 69. Three days later, Assistant Superintendent Beidleman advised Plaintiff that he had approved Plaintiff's transfer to McKinley. *Id.* ¶ 70. However, on the same day, Plaintiff received a letter denying his application. *Id.* ¶ 71. Plaintiff requested to meet with Kassnove, but she refused to discuss the matter with him. *Id.* ¶ 72. On August 18, 2014, Plaintiff received a letter reclassifying him

"from a Secondary Vice Principal to a Mathematics Teacher," reducing his annual salary by $22,000. *Id.* ¶ 73. Plaintiff was then assigned to Barringer High School. *Id.* ¶ 74. Plaintiff alleges that he was the only non-tenured vice principal from Weequahic to be demoted to teacher and was also the only "older African American male." *Id.* ¶ 75.

Sometime in September 2014, Plaintiff was injured at work and took medical leave. *Id.* ¶ 80. Plaintiff alleges that while on leave, the District revoked his prescription benefits without notice. *Id.* ¶ 79. Plaintiff claims that to restore his benefits, he was "forced to sign a contract" "under duress" that "would in effect have him concede to the demotion he received despite the ongoing grievance with the District." *Id.* ¶ 81. After this, Plaintiff claims that without any explanation, his paygrade was decreased from a "PhD level" to "Universal Master level." *Id.* ¶ 83. Plaintiff alleges that these actions caused him to seek therapy for depression. *Id.* ¶ 84.

During the 2014-15 school year, Plaintiff was assigned to a bilingual mathematics class where he was "unable to communicate with the students" because he is not bilingual. *Id.* ¶¶ 86, 88. Plaintiff claims that this assignment caused his "stress and depression [to] elevate[] to critical levels." *Id.* ¶ 89. Plaintiff alleges that Karleen Kemp, a Vice Principal of Mathematics, required him to "cover" several classes but that he received no extra compensation "despite his contract requiring . . . a quarter of a day's pay for each class he covered." *Id.* ¶ 91. Around February 10, 2015, Plaintiff questioned Ms. Kemp why he was not being properly compensated. *Id.* ¶ 92; D.E. 19-3 at 8. As a result, Westberry was "belittled" and eventually received a "partially ineffective" rating from her. *Id.* ¶ 92.

In August 2015, Plaintiff was transferred back to Weequahic to perform the duties of Athletic Director. *Id.* ¶ 93. Plaintiff alleges that he was "working in the dual capacity as Head[] of Athletics and [t]eacher," but that he was not paid for the additional responsibilities. *Id.* ¶ 97.

Plaintiff also claims that, in violation of his contract, he was not compensated for mentoring two teachers while he was employed at Barringer High School. *Id.* ¶¶ 99-102. Finally, Plaintiff maintains that he should have received a pay increase in February 2016 when all other administrators were given a raise. *Id.* ¶ 103. Although Plaintiff was classified as a teacher, he claims that he had been serving in an administrative role since 2009 and was entitled to the pay increase. *Id.* ¶ 104.

Plaintiffs filed a ten-count complaint in the Superior Court of New Jersey, Essex County. Defendants removed the matter to this Court on the basis of federal question jurisdiction. D.E. 1. Defendants filed a partial motion to dismiss, which Plaintiffs opposed. D.E. 2, 5. Judge Wigenton issued an oral opinion on the record and ordered Plaintiffs to file an amended complaint. D.E. 8-9. Plaintiffs filed an amended complaint alleging causes of action for (1) violation of the First Amendment, (2) violation of the Conscientious Employee Protection Act ("CEPA"), (3) violation of the New Jersey Law Against Discrimination ("LAD"), (4) breach of contract, (5) breach of the implied covenant of good faith and fair dealing, (6) promissory estoppel, (7) loss of consortium (for Plaintiff Koontz), (8) civil conspiracy, (9) intentional infliction of emotional distress, and (10) negligent retention. Defendants moved to dismiss all counts of the Amended Complaint, except Count Two. Plaintiffs filed an opposition, and Defendants replied.[3]

## III.    LAW AND ANALYSIS

### A. Standard of Review

---

[3] Defendants' brief in support of its partial motion to dismiss (D.E. 19) will be referred to as "Def. Br." Plaintiffs' brief in opposition (D.E. 20) will be called "Pl. Br." Defendants' reply brief (D.E. 21) will be referred to as "Def. Rep."

According to Rule 12(b)(6) of the Federal Rules of Civil Procedure, a court should dismiss a complaint when it fails "to state a claim upon which relief can be granted." In analyzing a motion to dismiss under Rule 12(b)(6) the court will "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Phillips v. Cty. of Allegheny*, 515 F.3d 224, 231 (3d Cir. 2008) (quoting *Pinker v. Roche Holdings Ltd.*, 292 F.3d 361, 374 n.7 (3d Cir. 2002)). In addition to the complaint, the Court may also consider any exhibits attached thereto. *See Pension Ben. Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993) (noting that when deciding a motion to dismiss, courts generally consider "the allegations contained in the complaint, exhibits attached to the complaint and matters of public record").

To survive dismissal, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Determining whether a complaint is plausible is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679. While not a "probability requirement," plausibility means "more than a sheer possibility that a defendant has acted unlawfully." *Id.* at 678. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Even if plausibly pled, however, a complaint will not withstand a motion to dismiss if the facts alleged do not state "a legally cognizable cause of action." *Turner v. J.P. Morgan Chase & Co.*, No. 14-7148, 2015 WL 12826480, at *2 (D.N.J. Jan. 23, 2015). Additionally, a court is

"not compelled to accept unwarranted inferences, unsupported conclusions or legal conclusions disguised as factual allegations." *Baraka v. McGreevey*, 481 F.3d 187, 211 (3d Cir. 2007).

**B. CEPA Waiver Provision**

Defendants argue that Counts One, Three, Four, Five, Six, Eight, and Nine are waived under CEPA because they rest on the same set of facts as the alleged CEPA violation. Def. Br. at 7-13. Plaintiff responds that the CEPA waiver is inapplicable at the motion to dismiss stage and that they should not have to choose which causes of action they wish to pursue until discovery is complete. Pl. Opp. at 11-28.

CEPA "is considered remedial legislation entitled to liberal construction, its public policy purpose to protect whistleblowers from retaliation by employers having been long recognized by the courts of this State." *Lippman v. Ethicon, Inc.*, 222 N.J. 362, 378 (2015); *see also Broad v. Home Depot U.S.A., Inc.*, 16 F. Supp. 3d 413, 416 (D.N.J. 2014) ("CEPA . . . prohibits employers from taking retaliatory actions against employees 'who "blow the whistle" on organizations engaged in illegal or harmful activity.'" (quoting *Young v. Schering Corp.*, 141 N.J. 16, 23 (1995))). The statute contains a waiver provision which provides as follows:

> Nothing in this act shall be deemed to diminish the rights, privileges, or remedies of any employee under any other federal or State law or regulation or under any collective bargaining agreement or employment contract; except that the *institution of an action* in accordance with this act shall be deemed a waiver of the rights and remedies available under any other contract, collective bargaining agreement, State law, rule or regulation or under the common law.

N.J.S.A. 34:19-8 (emphasis added).

The critical inquiry is whether the language "institution of an action" means that the waiver occurs when a complaint is filed. "The New Jersey Supreme Court has not determined when a plaintiff must make an election under CEPA's waiver provision, and courts in this district

8

are split on the question." *Rossi v. Vericare Mgmt., Inc.*, No. 13-6884, 2016 WL 6892075, at *4

(D.N.J. Nov. 22, 2016). In *Rossi*, Judge Wolfson analyzed this split in the case law explaining

that:

> Some courts in this district have held that "the CEPA waiver does not attach until after the completion of discovery." *Broad*, 16 F. Supp. 3d at 417; *see Chadwick v. St. James Smokehouse, Inc.*, No. 14-2708, 2015 U.S. Dist. LEXIS 38340, at *27-28, 2015 WL 1399121 (D.N.J. Mar. 26, 2015) ("A decision about CEPA waiver ought to be reached after discovery."); *Rubin v. Sultan Healthcare, Inc.*, No. 08-6175, 2009 U.S. Dist. LEXIS 41534, at *12, 2009 WL 1372272 (D.N.J. May 15, 2009) (concluding that "the CEPA waiver provision would not require a plaintiff to elect her remedy at the pleading stage of the litigation but rather defer the waiver until the plaintiff has had an opportunity to conduct discovery."). However, other courts in this district have held that, based on the provision's use of the phrase "institution of the action," a plaintiff "waive[s] all other CEPA-related claims upon his filing of a claim under CEPA." *Hornung v. Weyerhaeuser Co., Inc.*, No. 06-2300, 2007 WL 2769646, at *6 (D.N.J. Sept. 21, 2007); *see Hilburn v. Bayonne Parking Auth.*, No. 07-5211, 2009 WL 777147, at *3 (D.N.J. Mar. 20, 2009) (concluding that, "because the clear and unambiguous language of CEPA supports the interpretation that an action is 'instituted' upon filing, and because New Jersey courts have provided no authority to the contrary, the Court finds that Plaintiffs waived their CEPA-related claims upon filing their CEPA claim.").

*Id.*

Judge Wolfson concluded that "the CEPA waiver provision does not require a plaintiff to

elect his remedies until after the completion of discovery." *Id.* To support her conclusion, Judge

Wolfson partially relied on the New Jersey Supreme Court's decision in *Young*, 141 N.J. 16. In

that case, the Court stated in *dicta* that the language "institution of an action" in the CEPA

waiver provision "may be susceptible of meaning something other than the filing of a complaint

as contemplated by Rule 4:2–2." *Id.* at 32. The Court reasoned that the "meaning of 'institution

of an action' could conceivably contemplate an election of remedies with restrictions in which

the election is not considered to have been made until discovery is complete or the time of a pretrial conference contemplated by Rule 4:25–1." *Id.* However, the New Jersey Supreme Court ultimately did not decide the issue. *Id.*

Subsequently, the New Jersey Appellate Division interpreted *Young* "to mean that before electing remedies, a plaintiff should have an opportunity to complete discovery." *Maw v. Advanced Clinical Commc'ns, Inc.*, 359 N.J. Super. 420, 441 (App. Div. 2003), *rev'd on other grounds*, 179 N.J. 439 (2004). The court in *Maw* reasoned that CEPA's waiver provision should not bar a plaintiff's claims at the time the complaint is filed because "[o]nly after gaining access to all of the facts, will a plaintiff be in a position to make a knowing and meaningful election." *Id.*

Here, the Court finds that the CEPA waiver provision does not bar Plaintiff's other claims at the motion to dismiss stage. Plaintiff need not elect a remedy until after discovery is complete, and Plaintiff has been provided the opportunity to fully explore the facts at issue.[4] Moreover, the CEPA waiver provision is inapplicable as to Plaintiff's First Amendment claim. The waiver applies only to "the rights and remedies available under any other contract, collective bargaining agreement, *State* law, rule or regulation or under the common law." N.J.S.A. 34:19-8 (emphasis added). By its plain language, the waiver provision does not apply to federal causes of action. *Id.*; *see also Hilburn v. Bayonne Parking Auth.*, No. 07-5211, 2009 WL 235629, at *10 (D.N.J. Jan. 30, 2009) ("CEPA does not preclude federal claims, and thus Plaintiffs' claims in Counts 1 and 2 for violation of federally-protected rights are unaffected by CEPA's waiver

---

[4] The Court agrees with Judge Wolfson's reasoning in *Rossi* as well as the Appellate Division's decision in *Maw*. Moreover, in light of the remedial nature of CEPA, it would appear unduly harsh if a plaintiff faced summary judgment on the CEPA claim only to have also previously forfeited his other potential causes of action at the motion to dismiss stage.

provision."). Therefore, Defendants' motion to dismiss Counts One, Three, Four, Five, Six, Eight, and Nine as being waived under CEPA is denied at this stage of the litigation.

### C. Law Against Discrimination

Defendants contend that Plaintiff fails to plausibly plead a cause of action under the LAD. Defendants maintain that Plaintiff conclusively states that he suffered adverse employment actions due to his "race/ethnicity, sex, and/or age," but does not otherwise plead facts to demonstrate a *prima facie* LAD claim. Def. Br. at 15-16. Plaintiff counters that he has plausibly set forth facts establishing a claim for discrimination. Pl. Opp. at 14-16.

The LAD provides, in part, that it shall be an unlawful employment practice for an employer to discriminate against an employee because of his or her age, race, or sex. N.J.S.A. 10:5-12. "The essential purpose of the LAD is the eradication of the cancer of discrimination." *Quinlan v. Curtiss-Wright Corp.*, 204 N.J. 239, 258 (2010) (internal quotation marks omitted). "The LAD was enacted to protect not only the civil rights of individual aggrieved employees but also to protect the public's strong interest in a discrimination-free workplace." *Lehmann v. Toys R Us, Inc.*, 132 N.J. 587, 600 (1993) (citing *Fuchilla v Layman*, 109 N.J. 319, 335 (1988)).

In order to state a *prima facie* claim for discriminatory employment action, a plaintiff must allege facts showing "(1) that plaintiff is in a protected class; (2) that plaintiff was otherwise qualified and performing the essential functions of the job; (3) that plaintiff was terminated; and (4) that the employer thereafter sought similarly qualified individuals for that job." *Victor v. State*, 203 N.J. 383, 409 (2010). Here, Westberry pleads sufficient facts to meet

the first three elements, but not the fourth.[5]  Plaintiff fails to plausibly plead that he was replaced

with a similarly qualified person and for which position he was allegedly replaced.

Beginning in June 2013, Westberry alleges that he faced a number of adverse

employment actions.  First, Westberry's application to serve as a summer administrator in the

2013 summer program was denied.  Second, Westberry was reassigned from Athletic Director to

Interim Vice Principal of Mathematics.  Third, in June 2014, Westberry was informed that his

contract as Vice Principal for the 2014-15 school year would not be renewed.  On August 18,

2014, Westberry was reclassified as a mathematics teacher, which reduced his annual salary by

$22,000, and was then transferred to Barringer High School.  Plaintiff was also denied a vice

principal position at McKinley.  Finally, in August 2015, Plaintiff was transferred back to

Weequahic where he was "working in the dual capacity as Head[] of Athletics and [t]eacher,"

but was not paid for his additional duties.  Compl. ¶¶ 94, 97.

Plaintiffs' complaint fails to plead the requisite facts to satisfy the fourth element in a

claim for discrimination -- that the District sought similarly qualified individuals for Westberry's

position(s).  The Complaint is devoid of any specific allegations as to whom the District hired or

who was considered for Westberry's position each time he was transferred, demoted, or denied a

position.  In fact, the Complaint indicates that the District eliminated the athletic director position

previously held by Westberry.  Although Westberry alleges that he "was replaced with a much

younger Caucasian female," he does not indicate in which position (*i.e.* whether she replaced

---

[5] Westberry plausibly pleads the first three elements by alleging that (1) his race, age and sex fall within a protected class under the LAD, (2) he exceeded the Newark Schools' expectations for the students' scores on the High School Proficiency Assessment as an interim vice principal, was voted 2010 athletic director of the year (Compl. ¶ 24), and until the discrimination began, he always received positive ratings for his performance, and (3) he was demoted from his position of athletic director and vice principal to interim vice principal and subsequently to teacher. Plaintiff also plausibly pleads that he was qualified for the summer administrator position, eventually rising to principal, before the alleged discrimination began.

him as summer administrator, athletic director, interim vice principal, or vice principal at McKinley). Plaintiff also alleges that when he interviewed for the vice principal position at McKinley, "the other candidate for an administrative position . . . a younger Caucasian female, was not required to interview." *Id.* ¶ 63. It is not clear, however, whether this "younger Caucasian female" is the same person that allegedly replaced Westberry, assuming that the McKinley vice principal position forms the basis of his LAD claim.

Due to this lack of clarity, the Amended Complaint fails to plausibly state a claim for violation of the LAD. Therefore, Count Three is dismissed without prejudice.[6] Plaintiff may re-plead Count Three to address the deficiencies discussed above.

### D. The Grievance Procedure in the Collective Bargaining Agreement

Defendant maintains that Westberry's claims for breach of contract, breach of the covenant of good faith and fair dealing, promissory estoppel, and civil conspiracy must be dismissed due to Westberry's failure to arbitrate his claims as required by the grievance procedure set forth in the collective bargaining agreement (the "CBA"). Def. Br. at 16-22. In response, Plaintiff does not allege that he complied with the CBA's arbitration clause, but rather argues that the arbitration clause is ambiguous and "does not preclude the parties from seeking recourse in the courts." Pl. Opp. at 28-30.

"[W]here a collective bargaining agreement establishes a grievance procedure, an employee must at least attempt to exhaust such a process." *Podobnik v. U.S. Postal Serv.*, 409

---

[6] Throughout the Complaint, Plaintiff includes examples of alleged widespread discrimination by the Newark Schools. See, e.g., Compl. ¶ 121 ("Defendants eliminated several [a]dministrative positions throughout the district as pretext to discriminate against older, African American males."); *id.* ¶ 123 ("[T]hroughout the district, tenured employees were replaced with individuals much younger than those who lost their titles and positions."). These allegations, however, are akin to a class action on behalf of all of the District employees who were allegedly discriminated against. Yet, no class allegations have been made. As a result, the Court is focused on the discrimination allegedly suffered by Plaintiff, individually.

F.3d 584, 594 (3d Cir. 2005) (citing *Vaca v. Sipes*, 386 U.S. 171, 185 (1967)). Importantly, "an employer cannot be held liable for breach of a collective bargaining agreement unless it can be shown that the employee unsuccessfully sought relief through the union grievance procedure." *Id.*

Here, it is undisputed that Westberry was subject to a CBA[7] that set forth a grievance procedure. The CBA has a three-step grievance process. The third step contains an arbitration clause. The parties are in agreement that Plaintiff did not bring any grievances to arbitration. However, the parties dispute whether the CBA *required* Westberry to arbitrate his grievances as a prerequisite to filing a lawsuit. The arbitration clause provides, in relevant part, as follows: "In the event a grievance unresolved under the provision of Step 2, Article III, the grievant or CASA *may* have the grievance submitted to final and binding arbitration within seven (7) days of receipt of the decision of the Superintendent, or his/her designee."[8] D.E. 19-3 at 37 (emphasis added).

The parties have not directed the Court to any authority interpreting the word "may" as used in a CBA's arbitration clause. Through its own research, the Court found persuasive authority from other jurisdictions which found that "may" as used in an arbitration clause of a CBA means that the aggrieved party has the choice of continuing with the grievance procedure by going to arbitration or, alternatively, abandoning his claim. In other words, "may" means that the grievant is not required to go forward with the grievance process, but if he does, he must

---

[7] As an administrator from 2000 to 2014, Westberry was covered by the CBA between his union, CASA, and the District. When Westberry was reassigned from administrator to teacher, he was covered by the CBA between the District and the Newark Teachers Union. For purposes of this motion, there is no material difference between the grievance process for administrators and teachers. Therefore, for reasons of simplicity, references to "the CBA" will mean CASA's CBA.

[8] The Newark Teachers Union's arbitration clause similarly provides that "[i]n the event a grievance shall not have been settled under the above procedure, the employee may have the grievance submitted to binding arbitration . . . ." D.E. 19-3 at 93.

arbitrate. This interpretation of "may" was employed in a similar factual scenario in a case from

the Fourth Circuit:

> The next argument of Miss Austin is that arbitration of her Title VII and disability claims is permissive rather than mandatory. She relies on Section 1, Article 32 of the collective bargaining agreement which states that "all disputes not settled pursuant to the procedures set forth in Article 31, Grievance Procedures, may be referred to arbitration." She takes the position that the use of the word "may" as just stated makes arbitration permissive rather than obligatory. We are of opinion, however, that the purpose of the word "may" in this section of the collection bargaining agreement is to give an aggrieved party the choice between arbitration and abandonment of his claim, he "may" either arbitrate or abandon the claim. The interpretation urged by Miss Austin would render the arbitration provision meaningless for all practical purposes. If the parties to such an agreement intended for arbitration to be permissive, there would be no reason to include Article 32, the arbitration provision in the contract, for the parties to an existing dispute could always voluntarily submit it to arbitration.

*Austin v. Owens-Brockway Glass Container*, 78 F.3d 875, 879 (4th Cir. 1996). Other Courts

have reached a similar conclusion. *See, e.g.*, *Deaton Truck Line, Inc. v. Local Union 612*, 314

F.2d 418, 421 (5th Cir. 1962) (finding arbitration mandatory when contract stated "[i]f the Union

and the Company fail to agree, the dispute may be submitted to the arbitration"); *Babcock v.*

*Butler Cty.*, No. 12-394, 2012 WL 3877612, at *4 (W.D. Pa. Sept. 6, 2012) (interpreting

grievance procedure and concluding that the use of the word "may" means that "the grievant, if

unhappy with the outcome from Step Two can choose to appeal the matter to the Personnel

Director -- it is not required that the grievant appeal a Step Two outcome. He or she can choose

to accept the outcome from the Step Two decision-maker (i.e., the department head).").[9]

---

[9] The Court notes that in *Babcock*, the Middle District of Pennsylvania also relied on language in the CBA which stated that disputes "*shall be* settled in accordance with the following procedure." 2012 WL 3877612 at *4 (emphasis added). Although the CBAs here do not contain similar affirmative language, the Court does not find this to be a determinative factor. *See*

Here, the Court concludes that the use of the word "may" in the arbitration clause of the CBA's grievance procedure means that Westberry had the option of submitting his grievance to arbitration or abandoning his claim. In this context, "may" does not mean that arbitration was a permissive step of the grievance process that could be circumvented by the filing of a lawsuit. If that were the case, the arbitration clause would serve no real purpose because the parties could always voluntarily submit their dispute to arbitration. *See Owens-Brockway Glass Container*, 78 F.3d at 879. Instead, "may" merely means that Westberry had the option of continuing with the grievance process by submitting his claim to arbitration or abandoning the matter. The Complaint is devoid of any allegation that Plaintiff submitted a grievance to arbitration and Westberry does not argue otherwise in his brief. Therefore, Counts Four, Five, Six, and Eight -- the claims arising from alleged breaches of the CBA -- are dismissed without prejudice for failing to exhaust the CBA's grievance procedure.[10] Although Plaintiff may amend the counts if he chooses, he must plausibly address the CBA's grievance procedure, demonstrating why he is permitted to bring his claims in court.

### E. The New Jersey Tort Claims Act

Defendant argues that Plaintiffs' claims for intentional infliction of emotional distress ("IIED") and negligent retention must be dismissed because Plaintiffs did not file a timely tort claim notice. Defendant maintains that because Plaintiffs filed their notice of tort claims on

---

*Podobnik*, 409 F.3d at 594 (requiring employee to exhaust grievance procedure established by CBA).

[10] The parties do not address the potential impact, if any, of Section 301 of the Labor Management Relations Act on Westberry's claims. *See Allis-Chalmers Corp. v. Lueck*, 471 U.S. 202, 220 (1985) ("[W]hen resolution of a state-law claim is substantially dependent upon analysis of the terms of an agreement made between the parties in a labor contract, that claim must either be treated as a § 301 claim, or dismissed as pre-empted by federal labor-contract law." (internal citation omitted)). As a result, the Court does not review the issue.

April 29, 2015 any acts taking place before January 29, 2015, are time barred. Plaintiffs counter that the continuing tort doctrine saves their claims from being untimely.

The New Jersey Tort Claims Act ("TCA") provides that "no suit shall be brought against a public entity unless a claimant has furnished the appropriate public entity with a notification of claim." N.J.S.A. 59:8-3. The tort claim notice must be filed by the Plaintiff "not later than the 90th day after accrual of the cause of action." N.J.S.A. 59:8-8. If a plaintiff fails to comply with the 90-day notice period, he shall be "forever barred from recovering against [the] public entity or employee." *Id.* However, a plaintiff's claim, which would otherwise be barred as untimely, may be saved by the continuing tort doctrine.

The continuing tort doctrine provides that when an individual is subjected "to a continual, cumulative pattern of tortious conduct, the statute of limitations does not begin to run until the wrongful action ceases." *Wilson v. Wal-Mart Stores*, 158 N.J. 263, 272 (1999). "Under the continuing violation doctrine, 'when a defendant's conduct is part of a continuing practice, an action is timely so long as the last act evidencing the continuing practice falls within the limitations period; in such an instance, the court will grant relief for the earlier related acts that would otherwise be time barred.'" *Zankel v. Temple Univ.*, 245 F. App'x 196, 198 (3d Cir. 2007) (quoting *Brenner v. Local 514, United Bhd. of Carpenters & Joiners of Am.*, 927 F.2d 1283, 1295 (3d Cir.1991)). Additionally, a discrete act that causes a plaintiff to continue suffering damages beyond the act's occurrence does not convert the act into a continuing tort that extends the statute of limitations. *Russo Farms, Inc. v. Vineland Bd. of Educ.*, 144 N.J. 84, 114 (1996) (explaining that the "[p]laintiffs continued to suffer injury, but a wrongful act with consequential continuing damages is not a continuing tort, and does not lengthen the statute of limitations" (internal quotation marks omitted)).

Before analyzing whether the continuing tort doctrine saves Plaintiffs' claims for IIED and negligent retention, a more fundamental question must be addressed. That is, whether the continuing tort doctrine is applicable to such claims. Plaintiffs cite to no authority where the continuing tort doctrine has been applied to a claim for IIED or negligent retention.

In regard to the IIED claim, there does not appear to be any binding authority directly addressing whether the continuing tort doctrine may apply, and there are mixed results in other jurisdictions. *See Roberts v. Mintz*, No. A-1563-14T4, 2016 WL 3981128, at *4 (N.J. Super. Ct. App. Div. July 26, 2016) (declining to extend continuing tort doctrine to defamation claims and stating that New Jersey courts "have only applied it to hostile work environment claims under the Law Against Discrimination, and continuing nuisance claims"); *Mahon v. Hammond*, No. 1 CA-CV 14-0539, 2016 WL 337493, at *4 (Ariz. Ct. App. Jan. 28, 2016) ("No Arizona court has applied the continuing tort rule to emotional distress, and we see no reason to do so now."). *But see Hill v. City of Chicago*, No. 06 C 6772, 2007 WL 1424211, at *6 (N.D. Ill. May 10, 2007) ("In Illinois, the tort of intentional infliction of emotional distress . . . is considered a continuing tort which accrues, and the statute of limitations begins to run, at the time the last injurious act occurs or the conduct is abated." (internal quotation marks omitted)); *Wolff v. City of N.Y. Fin. Servs. Agency (FISA)*, 939 F. Supp. 258, 264 (S.D.N.Y. 1996) (stating that in New York "claims for IIED that allege a continuing pattern and practice of actionable behavior may invoke the continuing tort doctrine"). Nonetheless, solely for the purposes of this motion, the Court will assume that the continuing tort doctrine may apply to claims for IIED.

In order to state a claim for IIED a plaintiff must plead "intentional and outrageous conduct by the defendant, proximate cause, and distress that is severe . . . so as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized

community." *Taylor v. Metzger*, 152 N.J. 490, 509 (1998) (internal quotation marks omitted). "[I]t is extremely rare to find conduct in the employment context that will rise to the level of outrageousness necessary to provide a basis for recovery for the tort of intentional infliction of emotional distress." *Griffin v. Tops Appliance City, Inc.*, 337 N.J. Super. 15, 23-24 (App. Div. 2001) (quoting *Cox v. Keystone Carbon Co.*, 861 F.2d 390, 395 (3d Cir.1988)); *see e.g.*, *Rodridguez v. Ready Pac Produce*, No. 13-4634, 2014 WL 1875261, at *1, *6 (D.N.J. May 9, 2014) (dismissing IIED claim because plaintiff did not plead "any conduct that is 'beyond all possible bounds of decency'" when he alleged that he was terminated due to false accusations of "[a]dultery, having several girlfriends and talking in public of [his] personal affairs"); *Smith v. Twp. of E. Greenwich*, 519 F. Supp. 2d 493, 514 (D.N.J. 2007), *aff'd*, 344 F. App'x 740 (3d Cir. 2009) (granting summary judgment on IIED claim where the plaintiff only presented evidence that she was upset when she was issued a suspension and loss of benefits); *Acevedo v. Monsignor Donovan High Sch.*, 420 F.Supp.2d 337, 348-49 (D.N.J. 2006) (granting a motion to dismiss an IIED claim where plaintiff, a high school teacher, claimed that (1) the principal stated at a faculty meeting that it was his goal to reduce the median age of the faculty; (2) he was terminated because of his age; and (3) he suffered humiliation, anxiety, emotional distress, and pain and suffering); *Beasley v. Passaic Cty.*, 377 N.J. Super. 585, 610 (App. Div. 2005) (finding that the plaintiff's IIED claim was not sufficiently extreme and outrageous when it was based on suspensions without pay, restrictions on voluntary overtime eligibility, failures to give prompt raises, and absentee warnings).

Here, Westberry fails to allege conduct, whether viewed in isolation or as a continuing tort, that rises to the level of "intentional and outrageous conduct" required to state a claim for IIED. Westberry alleges the following twelve actions to substantiate his IIED claim: (1) in June

2013 he was rejected from serving as a summer administrator, (2) he was reassigned from athletic director and vice principal to interim vice principal for the 2013-14 school year, (3) Westberry's contract as interim vice principal was not renewed for the 2014-15 school year, (4) in June 2014 Westberry received for the first time in career a rating of "partially effective," (5) in the summer of 2014 he was initially offered, but then subsequently denied, the vice principal position at McKinley Elementary, and (6) in August 2014, Westberry was reclassified as a mathematics teacher and his salary was reduced (7) in September 2014 Westberry was forced to sign a new contract "under duress" in order to regain his prescription benefits while he was out on medical leave, (8) during the 2014-15 school year, Westberry was assigned to a bilingual mathematics class, despite being unable to communicate with 90% of the students, (9) in the same school year, Westberry was required to "cover" extra classes without receiving additional compensation, (10) in February 2015 Westberry received a partially effective rating from Kemp after questioning her why he was not paid for covering the extra classes, (11) in September 2015 Westberry assumed the dual role of teacher and athletic director at Weequahic, but was compensated only as a teacher, and (12) in February 2016, while employed as a teacher, Westberry did not receive a pay increase when all District administrators received a raise.

These actions may have caused stress and anxiety to Westberry (in addition to any claimed financial loss), but they do not, as a matter of law, rise to the level of being sufficiently outrageous and atrocious to constitute IIED. *See Rodridguez*, 2014 WL 1875261, at *1, *6 (D.N.J. May 9, 2014); *Smith*, 519 F. Supp. 2d at 514; *Acevedo*, 420 F.Supp.2d at 348-49; *Beasley*, 377 N.J. Super. at 610. Therefore, even if viewed collectively as a continuing tort extending beyond the 90-day claims notice period, the facts alleged fail to state a claim for IIED. Count Nine is dismissed without prejudice.

The Court next addresses Plaintiff's claim for negligent retention. The New Jersey Supreme Court first recognized the tort as a viable cause of action in *Di Cosala v. Kay*, 91 N.J. 159 (1982). To establish a claim for negligent retention, a plaintiff must plead that

> the employer knew or had reason to know of the employee's particular incompetence, unfitness, or dangerous attributes, (2) the risk of harm to others created by these qualities could have been reasonably foreseen by the employer, and (3) the employee's dangerous characteristics or unfitness and the employer's negligence was the proximate cause of the injury.

*McAllister v. Greyhound Lines, Inc.*, No. 96-2225, 1997 WL 642994, at *4 (D.N.J. Oct. 7, 1997), *aff'd*, 172 F.3d 41 (3d Cir. 1998).

The basis for Westberry's claim is the negligent retention of Superintendent Anderson. Plaintiff claims that he "made Defendants aware of the danger Defendant Anderson posed and how her plan would jeopardize the lives of young individuals throughout the system as well as violate the rights of administrators." Compl. ¶ 170. The Court assumes that Plaintiff is referring to his public comments concerning Superintendent Anderson in March and April of 2013. Plaintiff alleges that the District "retained Anderson despite this notice," which proximately caused him "significant harm." *Id.* ¶¶ 175-76.

Like his IIED claim, Plaintiff argues that his negligent retention cause of action is saved by the continuing tort doctrine. However, Plaintiff's Amended Complaint suffers from a more fundamental infirmity: he fails to plausibly plead facts that support his negligent supervision claim. Plaintiff merely claims that his public comments put the District on notice that Superintendent Anderson was unfit. However, his comments merely indicated that he disagreed with the Superintendent's proposal and, as a result, he faced improper reprisals.

Nevertheless, to support a claim for negligent retention, a plaintiff must plausibly plead factual allegations that show that the District knew or had reason to know of the

21

Superintendent's "particular incompetence, unfitness, or dangerous attributes." New Jersey has required the following types of factual allegations to support such a claim: an employee's possession of loaded firearms in a children's camp area, *Di Cosala*, 91 N.J. at 178; and retention of a corrections officer "who had an extensive disciplinary record[,]" *Hoag v. Brown*, 397 N.J. Super. 34, 55 (App. Div. 2007). Here, Plaintiff's allegations fall far short of the necessary conduct or history that would put the District on notice that Superintendent Anderson was unfit. Plaintiff has not sufficiently pled that the Superintendent had a particular incompetence, unfitness, or dangerous attribute much less that it was known (or should have been known) to her employer.[11] As a result, Count Ten is dismissed without prejudice.

### F. Loss of Consortium

Defendants argue that Plaintiff Koontz may not maintain a claim for loss of consortium deriving from a CEPA or LAD violation. Def. Br. at 23-24. Additionally, Defendants contend that because Westberry's IIED and negligent retention claims fail to state a claim, there is no primary tort claim to serve as the anchor for the derivative loss of consortium claim. *Id.* Plaintiff Koontz responds that *Flaherty v. Enclave*, 255 N.J. Super. 407, 413 (Law. Div. 1992) supports the proposition that a loss of consortium claim "stand[s] independent of CEPA," and therefore should be allowed to proceed. Pl. Opp. at 30-31.

"A loss of consortium claim is a derivative claim, depending upon the existence of tortious conduct on the part of the defendants." *Acevedo v. Monsignor Donovan High Sch.*, 420 F. Supp. 2d 337, 347 (D.N.J. 2006) (internal quotation marks omitted); *see also Toscano v.*

---

[11] Critically, timing is important in tort of negligent retention. The employee's incompetence, unfitness, or dangerous attribute must be known to the employer *before* the employee takes the action which causes a plaintiff's injury. A plaintiff cannot point to the actual conduct that caused his injury as proof that the employer knew or should have known of the dangerous or harmful proclivity of the employee.

*Borough of Lavallette*, No. 04-4412, 2006 WL 1867197, at *10 (D.N.J. June 30, 2006) (loss of consortium "is a derivative claim that depends [on] the existence of another cause of action"). "The primary claim upon which a loss of consortium claim depends must be legally sufficient to support such a derivative claim." *McKinnon v. Gonzales*, No. 07-1694, 2008 WL 305590, at *1 (D.N.J. Jan. 30, 2008). Neither CEPA nor the LAD "provide for a *per quod* action for loss of consortium." *Toscano*, 2006 WL 1867197, at *10; *see also Hurley v. Atl. City Police Dep't*, 174 F.3d 95, 130 (3d Cir. 1999) (concluding that "LAD makes no provision for . . . [a] loss of consortium claim"); *Catalane v. Gilian Instrument Corp.*, 271 N.J. Super. 476, 500 (App. Div. 1994) (holding that *per quod* damages are not recoverable under CEPA or the LAD).

Here, Plaintiff Koontz may not recover damages for loss of consortium pursuant to the LAD or CEPA. Plaintiffs' reliance on *Flaherty* is misplaced. In that case, the court found that the plaintiff's loss of consortium claim was not barred by CEPA's waiver provision. The court did not hold, as Plaintiffs suggest, that CEPA may serve as the primary claim to support a cause of action for loss of consortium. Additionally, for the reasons discussed above, the IIED and negligent retention claims have been dismissed and cannot be the anchor for the loss of consortium claim. Accordingly, Count Seven is dismissed without prejudice.

## IV. CONCLUSION

For the reasons set forth above, Defendants' motion to dismiss is granted in part and denied in part. Counts Three, Four, Five, Six, Seven, Eight, Nine, and Ten are dismissed without prejudice. Plaintiff may file an amended complaint within thirty days of this Opinion. An appropriate Order accompanies this Opinion.

Dated: May 19, 2017

John Michael Vazquez, U.S.D.J.

23